IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:21-cv-890 (RDA/IDD) |
| | ) |
| MANAGEMENT CONSULTING, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on the parties' cross-motions for summary judgment. Dkt. Nos. 25; 27. This Court has heard oral argument, and the matter has been fully briefed and is ripe for disposition. Having considered the statement of undisputed facts (Dkt. 23) in addition to each party's motion for summary judgment (Dkt. Nos. 26; 28), memoranda in opposition (Dkt. Nos. 29; 30), reply briefs (Dkt. Nos. 31; 32), and supplemental authority (Dkt. 37), this Court GRANTS summary judgment to Plaintiff United States and DENIES summary judgment to Defendant Management Consulting, Inc. for the reasons that follow.

### I. BACKGROUND

#### A. Factual Background

The factual record in this case is based on a stipulation by both parties, *see* Dkt. 23, and the filings in a related criminal case, *United States v. Thomson*, No. 1:10-cr-00067 (E.D. Va.). Defendant Management Consulting, Inc. ("Mancon") is a corporation that served as the prime contractor for two federal government contracts at issue in this case. Dkt. 23 ¶¶ 1, 18. In 2008, Mancon was awarded a prime contract with the U.S. Department of Health and Human Services (the "HHS Contract"), under which they provided services related to the Wounded Warrior

Program. *Id.* ¶ 1. In 2012, Mancon was awarded several prime contracts with the U.S. Marine Corps, involving providing recovery care coordinators and other services to the U.S. Marine Corps Wounded Warrior Regiment (collectively referred to as the "RCC Contract"). *Id.* ¶ 18. In each contract, Mancon subcontracted work to Armed Forces Services Corporation ("AFSC"), which further subcontracted work to Special Media Enterprises LLC ("SpecMed"). *Id.* ¶¶ 3-4, 7, 20-21. Mancon also directed some work on the RCC Contract directly to SpecMed through a series of purchase orders. *Id.* ¶ 22. For Mancon's work as the prime contractor, the United States paid it approximately $240 million under the HHS Contract and $25 million under the RCC Contract. *Id.* ¶¶ 6, 24.

In exchange for receiving subcontracts and purchase orders from AFSC on the HHS Contract, SpecMed made multiple kickback payments to AFSC executive Brodie Thomson. *Id.* ¶ 8. To pay for the kickbacks, Thomson directed SpecMed to mark up the amounts in its invoices to AFSC for work performed on the HHS Contract. *Id.* ¶¶ 9-12. SpecMed also paid kickbacks to Thomson and two other AFSC executives, Sarah Hackett Kim and Nicole Bazemore, in exchange for receiving purchase orders and subcontracts from AFSC on the RCC contract. *Id.* ¶¶ 25-28. The United States has not presented evidence that Mancon or its employees participated in, were aware of, or benefited from either kickback scheme while performing the contracts. *Id.* ¶¶ 13-15, 30-32. Furthermore, the United States has not presented evidence that Mancon passed the cost of the kickbacks on to the Government—for either contract. *Id.* ¶¶ 16, 33.

The kickbacks on the HHS Contract totaled $770,691.58, and the kickbacks on the RCC Contract amounted to $318,111.34. *Id.* ¶¶ 17, 34. Thus, the total amount of the kickbacks at issue in this case, and the amount the federal government seeks to recover from Mancon, is $1,088,802.92. *Id.* ¶ 40. AFSC has already paid the United States $4.3 million to resolve civil

2

claims under the False Claims Act, 31 U.S.C. §§ 3729–3733, the Anti-Kickback Act, 41 U.S.C. §§ 8702–8706, the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801–3812, and common-law theories including breach of contract, payment by mistake, unjust enrichment, and fraud. *Id.* ¶ 37.  The parties' settlement included claims based on the HHS Contract, the RCC Contract, and other contracts beyond the scope of this case.  *Id.*  Furthermore, Thomson has forfeited property valued at $162,646.98 pursuant to a judgment in a related criminal case. *Id.* ¶ 38.  The Defense Criminal Investigative Service ("DCIS"), the criminal investigative arm of the Office of Inspector General for the U.S. Department of Defense, has incurred about $711,000 in investigative costs to investigate the entire kickback scheme.  *Id.* ¶ 41.

## B. Procedural Background

Brodie Thomson, a former executive at AFSC, pleaded guilty to accepting over $4 million in kickbacks on four government contracts, two of which are at issue in this case.  *United States v. Thomson*, No. 1:10-cr-00067 (E.D. Va.), Dkt. 35.  Following that criminal prosecution, the United States reached a settlement with AFSC, resolving AFSC's civil liability for the kickbacks on the four contracts at issue in *Thomson*.  Dkt. 23 ¶ 37.  On August 3, 2021, the United States filed a Complaint in this Court against Mancon seeking to impose a civil penalty under the strict liability provision of the Anti-Kickback Act, § 8706(a)(2), based on the kickbacks SpecMed paid to AFSC employees on the HHS Contract and RCC Contract.  Dkt. 1.  Mancon filed an answer on September 28, 2021.  Dkt. 4.  The parties have stipulated to certain undisputed facts, and the Court granted a joint motion to proceed to dispositive motions based on these stipulated facts and the filings in the criminal case against Thomson.  *See* Dkt. Nos. 21; 23; 24.  On July 20, 2022, this Court heard oral argument on the parties' cross-motions for summary judgment.  Dkt. 36.  The United States filed a notice of supplemental authority on July 22, 2022.  Dkt. 37.

3

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is appropriate only if the record shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 615 (E.D. Va. 2014) (quoting Fed. R. Civ. P. 56(a)). "A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Id.* at 615-16 (quoting *Spriggs v. Diamond Auto. Glass*, 242 F.3d 179, 183 (4th Cir. 2001)). The moving party bears the "initial burden to show the absence of a material fact." *Sutherland v. SOS Intern., Ltd.*, 541 F. Supp. 2d 787, 789 (E.D. Va. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

On summary judgment, a court reviews the evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 570 (4th Cir. 2015) (quoting *Tolan*, 572 U.S. at 657); *McMahan v. Adept Process Servs., Inc.*, 786 F. Supp. 2d 1128, 1134-35 (E.D. Va. 2011) (citing *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)). This is a "fundamental principle" that guides a court as it determines whether a genuine dispute of material fact within the meaning of Rule 56 exists. *Jacobs*, 780 F.3d at 570. "[A]t the summary judgment stage[,] the [Court's] function is not [it]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A factual dispute alone is not enough to preclude summary judgment. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of

4

material fact." *Anderson*, 477 U.S. at 247-48. A "material fact" is one that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). The substantive law determines whether a fact is considered "material," and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" issue concerning a "material fact" arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 248.

### III. ANALYSIS

Mancon raises several arguments in opposition to applying the strict liability penalty. Mancon argues that the Anti-Kickback Act is remedial in nature and that the United States cannot recover further after having been "made whole," that charging a penalty in this case would violate the Eighth Amendment, and that Mancon is entitled to an offset against the United States' recoveries in other cases. The Court addresses these arguments in turn.

#### A. The Anti-Kickback Act's Dual Nature

Mancon asserts that the disposition of this case depends on the purposes of the Anti-Kickback Act. Dkt. 26 at 4. Mancon points to multiple sources describing the Act's nature as compensatory, arguing that the government cannot recover from Mancon after being "made whole" through both its settlement with AFSC and the forfeitures from Thomson in the related criminal case. *Id.* Though Mancon's argument is fundamentally sound when considered incrementally, its position fails to address the Anti-Kickback Act's text, the hidden costs of kickbacks, and the ineluctable fact that the Act serves both compensatory *and* deterrent purposes.

5

1. Statutory Scheme of the Anti-Kickback Act

Congress enacted the Anti-Kickback Act in 1986. 41 U.S.C. § 8706. The Act prohibits any person from providing, soliciting, or accepting kickbacks on federal contracts. 41 U.S.C. § 8702 (1)-(2). Additionally, the Act prohibits any person from including the amount of a kickback in the price of a federal contract. 41 U.S.C.§ 8702 (3).

The Anti-Kickback Act includes two provisions that are significant to this case. The "knowing provision," found at 41 U.S.C. § 8706(a)(1), allows the federal government to recover a civil penalty equal to twice the value of each kickback, plus $10,000 per occurrence, from persons who knowingly engage in conduct prohibited by § 8702. 41 U.S.C. § 8706(a)(1)(A)-(B). Another provision—known as "the strict liability provision," 41 U.S.C. § 8706(a)(2)—allows the government to recover a civil penalty equal to the amount of the kickback from any person whose "employees, subcontractors, or subcontractor employees" violate § 8702 by "providing, accepting, or charging a kickback." 41 U.S.C. § 8706(a)(2). In this case, the government disclaims any recovery based on the knowing provision. Instead, the United States seeks to impose civil liability on Mancon exclusively under the "strict liability" provision, based on the theory that Mancon's subcontractor's employees—Thomson, Kim, and Bazemore—provided and accepted kickbacks.

2. Application of the Act to this Case

The Court begins with considering the plain text of the Anti-Kickback Act's strict liability provision to this case. The government must first establish that Mancon is a "person" within the meaning of the Anti-Kickback Act. Second, the United States must prove that Mancon's "employee, subcontractor, or subcontractor employee" engaged in a potential violation of the Anti-Kickback Act. Third, the government must show that these subcontractors, or subcontractor employees, have violated the Anti-Kickback Act by "providing, accepting, or charging a

kickback." Assuming these elements are satisfied, liability may be imposed through a civil penalty "equal to the amount of the kickbacks." 41 U.S.C. § 8706(a)(2). Notably, there are no knowledge or intent elements or any other requirements to hold a contractor liable under the Act's strict liability provision.

As a corporation, Mancon qualifies as a "person" under the Act, which defines "person" as any "corporation, partnership . . . or individual." 41 U.S.C. § 8701(2). Thus, Mancon meets the first element of the Anti-Kickback Act's strict liability provision. Second, the Act defines "subcontractor" as any "person, other than the prime contractor, that offers to furnish or furnishes supplies . . . or services of any kind under a prime contract or a subcontract entered into in connection with the prime contract." 41 U.S.C. § 8701(8)(A). The stipulated facts establish that AFSC provided services to Mancon on both contracts, and that Thomson, Kim, and Bazemore were AFSC executives. Dkt. 23 ¶¶ 3, 8, 20, 25. Thus, Thomson and AFSC executives qualify as Mancon's "subcontractor employees." And third, the stipulated facts establish that Thomson, Kim, and Bazemore accepted kickbacks totaling $1,088,802.92, thus violating the Anti-Kickback Act by "providing, accepting, or charging a kickback." 41 U.S.C. § 8706(a)(2); Dkt. 23 ¶¶ 8, 25. Because the parties agree that Mancon's subcontractor employees violated the Anti-Kickback Act, the strict liability provision provides that the United States may recover a civil penalty equal to the amount of the kickbacks from Mancon. *See* 41 U.S.C. § 8706 (a)(1)-(2).

Section 8706(a)(2) provides that the government may recover a civil penalty from a prime contractor "*whose* employee, subcontractor, or subcontractor employee violates section 8702." *See* § 8706 (a)(1)-(2) (emphasis added). As a provider of services in its contracts with AFSC, SpecMed qualifies as a "subcontractor;" however it is less clear that SpecMed qualifies as *Mancon*'s subcontractor for the HHS contract, in which Mancon did not direct any work directly

7

to SpecMed. The Anti-Kickback Act's definition of "subcontractor" does not require contractual privity or specify whether a lower-tier subcontractor is considered the "subcontractor" of every higher-tier contractor. *Id.* Thus, depending on the construction of this portion of the Anti-Kickback Act, lower-tier subcontractors such as SpecMed *could* qualify as Mancon's subcontractors even without a direct contractual relationship with Mancon. Mancon argues that such an interpretation would allow the Government to recover from every higher-tier contractor in the event of a kickback between lower-tier subcontractors, generating a windfall for the United States and destroying any governmental incentive to prevent such kickbacks from occurring. Dkt. 26 at 4-5. Mancon homes in on the fact that SpecMed, the actual provider of the kickbacks at issue here, is situated two layers down the chain. On this basis, Mancon urges this Court to rule that the Act cannot be read to support recovery from every "layer" of the contractual chain.

Nonetheless, whether SpecMed would qualify as Mancon's subcontractor for the HHS Contract does not affect the issue of Mancon's liability in this case. Critically, although Mancon subcontracted some work on the RCC Contract to SpecMed directly, Mancon also subcontracted work to AFSC. Accordingly, AFSC undisputedly served as a subcontractor for Mancon. Thomson, Kim, and Bazemore were each AFSC employees. Each of them undisputedly accepted $1,088,802.92 in kickbacks while they were Mancon's subcontractor's employees, providing the basis for Mancon's liability for the kickbacks on both contracts under the strict liability provision of the Anti-Kickback Act. *See* 41 U.S.C. § 8706(a)(2). Therefore, those three employees were "subcontractor employees" under the Anti-Kickback Act, giving rise to liability under the statute. Nor does the issue of whether SpecMed might qualify as Mancon's subcontractor affect the extent of Mancon's liability, as the strict liability provision only allows a recovery equal to the amount of the kickbacks, with no "per-occurrence" penalty. *See id.* Regardless of whether SpecMed is

8

considered Mancon's subcontractor, the government's potential recovery from Mancon is limited to the amount of the kickbacks. Thus, whether the Anti-Kickback Act can be construed to permit recovery at every potential layer of a contractor-subcontractor chain does not affect the outcome of this case, and the Court has no occasion to apply the law to that set of facts. *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) ("[A] court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself. Where, as here, that examination yields a clear answer, judges must stop.").

Because each of the elements of a "strict liability" violation is satisfied, Mancon is liable for a "civil penalty equal to the amount of [the] kickback[s]" received by its subcontractor employees. 41 U.S.C. § 8706(a)(2). The stipulated facts establish that AFSC executives received a total of $1,088,802.92 in kickbacks on the HHS and RCC Contracts, and the Act dictates an equivalent civil penalty from Mancon. *See* 41 U.S.C. § 8706(a)(2). Mancon has not disputed these elements. This Court agrees with the United States that the elements of the Anti-Kickback Act have been met and finds that the Act's plain text imposes strict liability on Mancon for the amount of the kickbacks.

### 3. Purposes and Nature of the Anti-Kickback Act

#### a. Congressional Purpose

Instead of disputing the elements of § 8706(a)(2), Mancon argues that liability should not be imposed in this case because the Act is "remedial in nature." Dkt. 26 at 3-4. Mancon argues that the Government cannot recover from Mancon after having recovered from Thomson in a criminal case and AFSC in a settlement, pointing to the discussion of the Act's compensatory purposes in *Kellogg Brown & Root Servs. v. United States*. 99 Fed. Cl. 488, 505 (2011). Specifically, the Court of Claims concluded that "if the remedial purpose of [the Anti-Kickback

9

Act] is satisfied under [§ 8706(a)(1)] and the Government is 'made whole,' no need exists for the Government to re-collect the kickback amount under [§ 8706(a)(2)]." *Id.* Importantly, this was in the context of the United States' attempt to recover under both the Act's knowing provision *and* the strict liability provision from a single defendant. *Id.* The *Kellogg Brown* court did not suggest that the government's potential recovery in a given case was limited to its quantified damages or reduced by recoveries in related cases and settlements.

In the present case, the government is only pursuing recovery from Mancon under the strict liability provision, 41 U.S.C. § 8706(a)(2), so the court's reasoning in *Kellogg Brown* does not speak directly to the issue presented. Furthermore, other authority discounts Mancon's assertion that the government cannot pursue the full statutory penalty against Mancon after recovering from others. For example, in *United States v. Kruse*, this Court held Eastern Electric, the defendant subcontractor therein, liable under the "strict liability" provision, and held Carl Kruse, an Eastern Electric executive, liable under the "knowing" provision. 101 F. Supp. 2d 410, 414 (2000). The government ultimately recovered a total of $2,353,680, even though the amount of the kickback at issue was $784,560 and the government's expenses arising out of related investigations totaled only $380,668.88. *Id.* Thus, Mancon's argument that the Act serves compensatory purposes, even if true, does not preclude the government from recovering the amount of the kickbacks from Mancon after settling with AFSC. For example, the Southern District of Texas recently found that the United States' recoveries in previous cases are irrelevant to the application of the strict liability provision. Dkt. 37; *United States v. Kellogg Brown & Root Inc.*, No. 4:06-cv-04024 (S.D. Tex. May 10, 2022). There, the district court granted the United States' motion to exclude evidence that the government had previously recovered $5.5 million in connection with the subcontract at issue in that case. *Id.* at 1.

b. Legislative History

While not essential to the disposition of this case, legislative history adds helpful context and purpose of the Anti-Kickback Act. As Mancon argues, the Anti-Kickback Act has, at least in part, a compensatory objective. The Congressional Record states that the higher penalty in § 8706(a)(1) "provides a mechanism that will more nearly compensate the Government for all of its damages." 132 Cong. Rec. S16310. Mancon contends that this compensatory objective is fulfilled when parties whose "kickbacks *affect* a prime contract with the United States" are held liable. 32 Cong. Rec. S16307-01 (1986), 1986 WL 788464 at *9 (emphasis added). Because the parties agree that Mancon did not pass on the costs of the kickbacks to the government, Mancon argues that the prime contract has not been "affected" by the kickbacks at issue, and the Government need not be compensated. Dkt. 29 at 3; *see also* Dkt. 23 ¶¶ 13-16, 30-33. Yet a kickback can "affect" a prime contract not only when the prime contractor passes on inflated costs, but also via the costs of "detecting and investigating the kickbacks; the cost of kickbacks [the government] fails to discover; and [] other excess charges and performance problems caused by corrupt subcontractors." S. Rep. 99-435 at *16; *see also Kruse*, 101 F. Supp. 2d at 414 (reasoning that damages from kickbacks "evade ready determination" and finding that the Anti-Kickback Act's penalty "reasonably relates to the actual costs the government suffers when kickbacks occur") (quoting *United States v. Lippert*, 148 F.3d 974, 977 (8th Cir. 1998)).

Furthermore, the objectives of the Anti-Kickback Act are not purely compensatory. The Act provides for "civil penalties" and does not require the United States to establish "specific damages." *See* 41 U.S.C. § 8706(a)(1)-(2). The Congressional Record also provides that one of the Anti-Kickback Act's goals is to incentivize prime contractors to "exercise their oversight capabilities," as the United States is authorized to seek civil penalties even in cases "where no

11

prime contractor employee was involved in the fraud." S. Rep. 99-435 at *15-16.  Mancon argues that the Government does not suggest any failure on the part of Mancon to supervise its subcontractors.  Dkt. 29 at 4.  Nonetheless, the text of the Anti-Kickback Act does not require the government to prove any such failure in order to recover under the strict liability provision.  *See* 41 U.S.C. § 8706(a)(1)-(2).

### B. Eighth Amendment Claim

Mancon also brings a constitutional challenge, arguing that a $1,088,802.92 fine in this case would be excessive under the Excessive Fines Clause of the Eighth Amendment.  The Eighth Amendment of the United States Constitution provides:  "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  The second clause, the Excessive Fines Clause, "limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense."  *Austin v. United States*, 509 U.S. 602, 609-610 (1993) (internal quotation marks and citation omitted).  For the following reasons, the Court finds that the penalty in this case does not rise to the level of a constitutional violation.

Mancon styles its argument as an "as-applied" constitutional challenge, arguing that its lack of involvement in the kickback scheme distinguishes this case from past cases involving application of the strict liability provision.  Thus, Mancon argues that the strict liability provision is only enforceable as long as it is applied to a defendant with some knowledge of the kickback scheme.  Mancon's argument largely relies on the relative novelty of this case, as past applications of the strict liability provision have generally involved defendants who either benefitted from or knew about the kickbacks.  *See Kruse*, 101 F. Supp. 2d at 414.  Mancon offers no specific facts that might make this case an exception to the text of the statute.  Instead, Mancon takes issue with

12

the "decision by the United States Attorney's Office" to pursue this case. Dkt. 31 at 2. As the United States argues, this is essentially a facial attack on the law, as the strict liability provision plainly contemplates liability without regard to a defendant's knowledge of the kickback scheme. *See* 41 U.S.C. § 8706(a)(2).

When a court reviews an "as-applied" challenge, it must examine only the application of the law to the particular parties and the facts of the case before it, without considering whether the statute theoretically could be construed as unconstitutional in another hypothetical case. *See United States v. Stevens*, 559 U.S. 460, 473 n.3 (2010) (observing that case-specific "factual assumptions . . . can be evaluated only in the context of an as-applied challenge."). An as-applied challenge requires only that the law is unconstitutional as applied to the challenger's case; a facial challenge requires this showing as well, but it also requires that there be "no [other, theoretical] set of circumstances" in which the law could be constitutionally applied. *United States v. Salerno*, 481 U.S. 739, 745 (1987). Because Mancon's constitutional challenge finds its footing in an argument about the government's enforcement discretion, this Court views Mancon's theory as a facial challenge under the Eighth Amendment.

The Court does not find the statutory penalty unconstitutionally excessive, either on its face or as applied to Mancon. A fine is unconstitutionally excessive under the Eighth Amendment if its amount "is grossly disproportional to the gravity of the defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 336-37 (1998). "From *Bajakajian* a two-part analysis can be distilled to determine whether the Excessive Fines Clause restricts the Government's ability to collect civil penalties. First, the Court must determine whether the recovery sought is remedial or punitive. Secondly, if the Court finds the remedy to be punitive, it must then decide whether the recovery

sought is grossly disproportionate to the gravity of the offense." *Kruse*, 101 F. Supp. 2d at 413 (citing *Bajakajian*, 524 U.S. at 413).

As an initial matter, the Court assumes that the recovery the government seeks is better understood as a punitive remedy. Accordingly, the Court analyzes whether the recovery sought is grossly disproportionate to the gravity of the offense. Mancon cites *United States v. Kruse* as an example of this Court finding a penalty under the Anti-Kickback Act unconstitutionally excessive under the Eighth Amendment's Excessive Fines Clause. 101 F. Supp. 2d at 414. Kruse, one of the defendants in that case, had paid 59 separate kickbacks, and the Court found that the $10,000 per-occurrence penalty in § 8706(a)(1) would constitute an "impermissible punishment" under those circumstances. *Id.* But the Court also held that the Anti-Kickback Act's civil penalties, "insofar as they reimburse the government, if roughly," were not subject to the Excessive Fines Clause. *Id.* Considering this finding, the Court imposed the remainder of the penalty under § 8706(a)(1) on Kruse, which amounted to twice the value of the kickbacks. *Id.* Importantly, the Court found that the strict liability penalty was not unconstitutionally excessive as applied to Eastern Electric, a defendant corporation. *Id.*

This case involves mere application of the strict liability provision, which has no per-occurrence penalty and fixes damages equal to the value of the kickback. *See* § 8706(a)(2). This Court in *Kruse* found that such a penalty was constitutional as applied to Eastern Electric. *See Kruse*, 101 F. Supp. 2d at 414. While Mancon attempts to distinguish *Kruse* on the basis that Eastern Electric received subcontracts in return for the kickbacks, this was not a factor in the Court's determination. *Id.* Instead, the Court considered the damages, "quantifiable and unquantifiable," that the kickbacks caused to the government and the procurement system generally. *Id.* The government had incurred $380,668 in investigative and other expenses, and

14

the Court found that the government's recovery of $784,560 from Eastern Electric was not impermissibly excessive. *Id.* In light of this fact, and considering the stipulated $711,000 in investigative expenses incurred by the government in this case, this Court does not conclude that the recovery sought is grossly disproportionate to the gravity of the offense.

While Mancon asserts that the company has committed "no offense" and that Mancon is "wholly innocent," Mancon offers no challenge to the government's *prima facie* case under the strict liability provision. Dkt. 28 at 5. The text of the Act reflects Congress's intent, as expressed in the Congressional Record, to "fix [] vicarious civil liability, without regard to fault, on the Federal prime contractor." 1986 U.S.C.C.A.N. at 5967. Moreover, *Bajakajian* provides that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Bajakajian*, 321 U.S. at 336. Congress has made this judgment, as evidenced by the Anti-Kickback Act's comparatively larger penalty for violators of the "knowing" provision. *See* 41 U.S.C. § 8701(a)(1).

Though Mancon's predicament is unfortunate, and the Court appreciates the policy concerns Mancon raises with respect to applying the Anti-Kickback Act's strict liability provision in edge cases, this Court does not find that the strict liability provision's penalty rises to the level of a constitutional violation in this case.[1]

C. Mancon has No Right to Offset its Penalty Against the United States' Past Recoveries

Finally, Mancon argues that its civil penalty should be offset against the government's settlement with AFSC. This Court has held that "the silence of such federal statute counsels

---

[1] This Court in *Kruse* said that a "statutory penalty that is proportional to the losses incurred may not necessarily trigger the Eighth Amendment's protection." 101 F. Supp. 2d at 414. For purposes of this case, the Court assumes without deciding that a statutory penalty proportional to the losses incurred does, in fact, fall within the reach of the Excessive Fines Clause.

against allowing a set-off for settlement." *Crump v. United States Dep't of the Navy*, 205 F. Supp. 3d 730, 764-65 (E.D. Va. 2016). The text of the Anti-Kickback Act does not authorize any offset, and offsetting Mancon's liability against past settlements would run contrary to other cases applying the Anti-Kickback Act. The Court does not find an offset appropriate in this case.

Mancon has not cited any authority in which a court has applied an offset when interpreting the Anti-Kickback Act. In *Kruse*, this Court allowed the government to recover $784,560 from Eastern Electric under the statute's strict liability provision and $1,569,120 from Kruse under the Act's knowing provision. 101 F. Supp. 2d at 414. The amount of the kickback was $784,560, and the government's quantified expenses totaled only $380,668.88. *Id.* Thus, the government's recovery equaled three times the amount of the kickback and vastly exceeded any quantified expenses, yet the Court did not apply any offset. *Id.* Similarly, the Federal Circuit has upheld a civil penalty against a defendant prime contractor without applying an offset, even though the defendant's subcontractor had previously reached a negotiated resolution with the government. *See Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1371 (Fed. Cir. 2013), *opinion corrected on denial of reh'g*, 563 F. App'x 769 (Fed. Cir. 2014).

Because no case interpreting the Anti-Kickback Act has applied an offset, Mancon's argument relies on analogy to other statutes, including the False Claims Act. The False Claims Act provides for both "damages" and "penalties," and courts have routinely offset damages without applying any offset to penalties. *See, e.g.*, *United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 401 (4th Cir. 2013) ("[T]he court thus decided that Gosselin was entitled to a full offset, with no damages remaining payable," but "[i]t remained for the district court to calculate the appropriate civil penalties for the Bunk false claims."); *United States v. Zan Machine*, 803 F. Supp. 620, 625 (E.D.N.Y. 1992) (applying an offset only to the "damages

16

provision" of the False Claims Act, not the "civil penalty" provision). This weakens any analogy between the False Claims Act and the Anti-Kickback Act, which expressly provides for "civil penalties." 41 U.S.C. § 8706(a)(1). Mancon argues that the court in *Kellogg* referred to § 8706(a)(1) as the "double damage provision," but in that case the court declined to offset the defendant's liability against past settlements. 728 F.3d at 1370. Therefore, this Court concludes that Mancon is not entitled to an offset against the government's settlement with AFSC. *See* § 8706(a)(2).

## IV. CONCLUSION

For the reasons set forth above, this Court finds that Mancon is liable to the United States under 41 U.S.C. § 8706(a)(2) for $1,088,892.88, the amount of the kickbacks. Accordingly, it is hereby ORDERED that Defendant Mancon's Motion for Summary Judgment (Dkt. 25) is DENIED and Plaintiff United States' Motion for Summary Judgment (Dkt. 27) is GRANTED.

The Clerk is directed to enter judgment for Plaintiff United States in the amount of $1,088,802.92 pursuant to Federal Rule of Civil Procedure 58, forward copies of this Memorandum Opinion and Order to counsel of record, and close this civil action.

It is SO ORDERED.

Alexandria, Virginia
October 24, 2022

/s/
Rossie D. Alston, Jr.
United States District Judge